No. 26,586.

C. W. BEELER, *Appellant,* v. JOHN LIND et al., *Appellees.*

SYLLABUS BY THE COURT.

CHATTEL MORTGAGES—*Sale of Property—Authorization and Ratification—Evidence.* In replevin to recover cattle under a mortgage, where the defenses were that a sale by the mortgagor of the cattle sued for had been authorized and ratified by the mortgagee, it is held that, treating one matter in dispute as settled by a special finding, there is no evidence to support a judgment for the defendants.·

Appeal from Chase district court; ISAAC T. RICHARDSON, judge. Opinion filed April 10, 1926. Reversed.

*Bennett R. Wheeler, S. M. Brewster, John L. Hunt,* all of Topeka, and *A. L. Moffat,* of Kinsley, for the appellant.

*Gilbert H. Frith, Louis E. Clevenger,* both of Emporia, and *Charles E. Davis,* of Cottonwood Falls, for the appellees.

The opinion of the court was delivered by

MASON, J.: On October 23, 1922, C. W. Beeler sold to E. D. Swayze 933 steers for $47,910, taking a chattel mortgage on them for the full amount. On February 18, 1923, Swayze sold 300 head

Agency, 2 C. J. pp. 474 n. 2, 475 n..9. Chattel Mortgages, 11 C. J. pp. 623 n. 18, 626 n. 59, 636 n. 75.

of cattle to John Lind and W. H. Hyle, of which Lind took 100 head and Hyle 200, paying in proportion. Of these cattle sold by Swayze 285 were covered by Beeler's mortgage. Swayze told Beeler the number covered by his mortgage was about 200. Swayze turned over to Beeler a check given him by Hyle for $10,748, and gave him, to make up for the 200 head sold, on a proportionate basis, a note for $2,000 with a mortgage on some other cattle securing it. Beeler later discovered the cattle included in the mortgage to him belonged to Swayze's wife and obtained her signature to it. He also discovered that instead of 200 head covered by his mortgage having been included in those sold to Lind and Hyle, the number was 285. He brought this action of replevin against Lind, joining Swayze as a defendant, to recover the cattle held by Lind covered by his purchase-money mortgage, obtaining possession on an order of delivery. A trial resulted in a judgment against him for their value —$6,243.75—and he appeals. A former trial resulted in a similar judgment, which was reversed. The facts are more fully set out in the opinion on the first appeal. (*Beeler v. Lind,* 118 Kan. 276, 235 Pac. 113.)

The defense was based on two propositions—that the plaintiff had authorized the sale by Swayze, and that by his later conduct he had ratified the transaction after learning the facts regarding it. The jury in response to special questions found against him on each. The plaintiff contends there is no evidence to support either theory.

There are several quite different situations in which it might be said that Swayze had a right to sell the mortgaged cattle.

(1) He could, regardless of the plaintiff's attitude, sell his own interest in the cattle—sell them subject to the mortgage; that is, he could give title to the purchaser, although to do so without the mortgagee's permission might by the terms of the mortgage have accelerated its maturity. His power to do this, however, or his doing it, could not affect the plaintiff's lien. And we interpret the evidence as showing that this is what actually took place. Lind and Hyle seem to have been willing to pay Swayze for the cattle and trust to him to see that the mortgage was satisfied either out of the money paid him or from some other fund, that matter being immaterial to them.

(2) He might, with a valid permission from the plaintiff, have sold the cattle free from the mortgage, taking and retaining in himself the title to the proceeds, and leaving the plaintiff as a mere un-

secured creditor to look to him to pay what he owed for them. This appears to have been Swayze's conception of what was done. An agreement that he might do this, however, would be inconsistent with the effectiveness of the mortgage. If made orally before or at the time of its execution it would be invalid under the parol-evidence rule. If made later it would be destructive of the plaintiff's lien and would doubtless require a new consideration. Swayze testified that sometime after the mortgage was executed Beeler "said he thought I ought to sell the cattle; that is, that it would be a good plan to sell them while I had them in such good shape, and he thought they would make plenty of money, and to sell them when they were in good condition for spring delivery, you understand, or any time I could." We do not think this or similar testimony has any substantial tendency to show an abandonment of the mortgage. The talk narrated is merely the advice of the mortgagee to the mortgagor as to the best course to further their common interest. If the security was good, the mortgagor was the person concerned in what the cattle should bring, and it was for him to decide the terms on which a sale should be made.

Or (3) Swayze, with authority from Beeler, might as his agent have made a sale, holding the proceeds as the property of his principal. This seems to be the construction sought to be placed on the transaction in the defendants' brief. We do not find in the testimony just quoted nor elsewhere in the record anything tending to support that theory. Swayze apparently did not suppose he was under an obligation to turn over to Beeler all he had received for the mortgaged cattle. When Beeler reminded him that the Hyle check was not all the purchase price, he answered: "No, sir; it's not all the purchase price, but about the average of what they cost me." He said: "I told him about the expense of the cake, etc., but I figured that was what I owed for the cattle." He testified:

"When you sold these cattle to Hyle and Lind, you sold them as your own cattle? Sure, I did.

"On your own account? On my own account.

"You didn't sell them as anybody else's cattle? No.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"On your own account? I sold them as my cattle.

"In that transaction you pretended to act for yourself and nobody else? Yes, sir."

Concerning knowledge of the mortgage Lind said:

"I didn't go to the record, but I asked Swayze if they were mortgaged out

at the farm. I would like to change that statement. I don't know as I asked him either. The question came up; I don't know whether I asked him; it was brought up when we were tally branding. I took it for granted then that the cattle were mortgaged."

It results from what has been said that the finding of the jury, that at the time Swayze sold the cattle in question to Lind he had authority from Beeler to make such sale, is without support in the evidence unless it should be interpreted as meaning merely that Swayze had a right to sell the cattle subject to the mortgage against them. The judgment therefore cannot be upheld unless upon the ground that his conduct after the sale was such as to destroy his lien.

The term "ratification" has been used as describing such conduct. There was, however, upon any view of the evidence, no ratification by Beeler of a sale made by Swayze as his agent, for Swayze did not profess to be acting in that capacity in selling the cattle, but acted avowedly for himself alone, and in that situation there was no opportunity for ratification in the ordinary sense. (2 C. J. 474-475; 21 R. C. L. 923; Story on Agency, § 251.)

"Since the effect of ratification is to confirm the act as done, it is indispensable, in order to have an act of agency, that the act ratified must have been done by the assumed agent as agent and in behalf of a principal. If the act was done by him as principal and on his own account, or on account of some third person, it cannot thus be ratified.

"And not only must the assumed agent have *intended* to act as agent for the person ratifying, but, as declared by the house of lords after most elaborate consideration and according to the weight of authority in the United States, he must have *professed* to act for a principal, though it is not necessary that he should have disclosed who that principal was if he be capable of identification within the rule already laid down." (1 Mechem on Agency, 2d ed., § 386.)

The defendants urge that there are exceptions to this rule, and cite *Latham v. National Bank,* 40 Kan. 9, 18 Pac. 824, as presenting one of them, contending that there is a close analogy between that case and this. There one in charge of another's cattle in which he had an interest mortgaged them in his own name. The proceeds were used for the purchase of cattle to increase the herd. The mortgage was held valid against the owner, who with knowledge of its existence, at the request of the mortgagor, remained silent about his ownership for some two years. In the opinion the owner was said to have ratified the act of the mortgagee, but the decision was founded on what amounted to estoppel and negligence of the owner.

It is quite immaterial here whether the term ratification was there used with strict accuracy. The equities were clearly with the mortgagee. So we think they are here. Beeler sold the cattle to Swayze on time, taking a mortgage for the price which he duly filed for record. Lind and Hyle bought the cattle from Swayze with constructive and actual knowledge of the mortgage, paying him the full price without making any arrangement for the payment of the lien. Beeler when he learned of the sale, understanding that only 200 head of the cattle bought from him were involved, consented to accept from Swayze in satisfaction of his lien against them a *pro rata* amount of the debt (less $900 spent for feed), being made up of the check given by Hyle, and Swayze's note for $2,000, supposed to be secured by a mortgage on other cattle. The payment was made to him by Swayze, who owed him, and the fact that it included the check given Swayze by Hyle does not involve anything wrong, inequitable or unjust on his part, nor impair his lien on the other cattle. If his arrangement with Swayze had been made after he knew that 285 head of his cattle, instead of 200, had been sold, the evidence might have justified a finding that he had waived his lien against all of them—made a settlement as to them. But the jury specifically found that it was about July 15 when he learned that Swayze had sold more than the 200 head he reported. The note and mortgage for $2,000 were signed by Swayze July 9. Clearly no loss of his right to look to the other cattle took place at that time.

The defendants strongly urge, however, that in obtaining Mrs. Swayze's signature to the $2,000 mortgage after he had learned that more than 200 head had been sold he created a situation such as to warrant a finding that the lien of his mortgage was lost as to the entire 285 head. We do not think this contention sound. When Beeler was informed that Swayze had sold and received the money for 200 head, the two made an adjustment of the matter by which the 200 head were to be freed from the lien and Beeler was to receive from Swayze a proportionate amount of the mortgage debt (less the $900 spent for feed), a part of this being paid by turning over Hyle's check for $10,748 and the rest provided for by the note and mortgage for $2,000. When Beeler found that his mortgage was worthless because the cattle it described belonged to Mrs. Swayze he naturally tried to get her to remedy this situation by signing it, and his effort was successful. We see nothing in the fact of Mrs. Swayze having signed the mortgage, or in anything that was said or

Beeler v. Lind.

done in that connection, tending to show a change, or any intention of making a change, in the arrangement that had already been entered into, such as to involve a release of 285 head instead of 200 head from the lien of the mortgage. Beeler obtained from the validation of the $2,000 mortgage just what he was supposed to have received in the first instance—security for the $2,000 note. Lind suffered no disadvantage from the addition of Mrs. Swayze's signature. Beeler received in effect only what he had already bargained for.

The case differs from that presented upon the first appeal in that here the jury specifically found that at the time of the adjustment between Beeler and Swayze, Beeler had not been undeceived as to the number of cattle sold. Treating this finding as settling that matter, we hold that the evidence does not permit a judgment for the defendants. The other findings, with three exceptions to be noted, are consistent with what has been said and with this conclusion. A finding that Swayze had authority from Beeler to sell the cattle has already been referred to, the reasons being shown for not giving it effect. The jury returned a negative answer to the question whether the amount of the $2,000 mortgage was arrived at by figuring the amount due upon a sale of 200 head of cattle reported by Swayze. The answer may be regarded as correct by considering that $900 was deducted from the amount so arrived at. The jury found that Beeler's act in accepting the chattel mortgage for $2,000 signed by Mrs. Swayze amounted to a ratification of the sale, as the term was explained in the instructions. So far as this finding is other than a conclusion of law, we think, upon grounds already sufficiently indicated, it was not sustained by evidence.

The judgment is reversed, with directions to render judgment for the plaintiff.

HARVEY, J., not sitting.